IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

CHESTER GROSSMAN and SHELBY                )
GROSSMAN,                                  )
                                           )        2:20-CV-01801-CCW
            Plaintiffs,                     )
                                           )
      v.                                    )
                                           )
TROOPER JOHN MORNINGSTAR,                   )
                                           )
            Defendant.                      )
                                           )

## OPINION

Before the Court is a Motion for Summary Judgment, *see* ECF No. 30, filed by Defendant,

Trooper John Morningstar.[1]  For the following reasons, the Motion will be GRANTED IN PART

and DENIED IN PART.

## I.      Background

### A.      Procedural History

On November 19, 2020, Plaintiffs Chester Grossman and Shelby Grossman filed a

Complaint against the Pennsylvania State Police ("PSP") and Trooper Morningstar in his

individual and official capacities.  *See* ECF No. 1.  The PSP and Trooper Morningstar filed an

Answer.  *See* ECF No. 9.  On September 21, 2021, the Grossmans filed a Notice of Voluntary

Dismissal as to PSP, thereby terminating PSP from the case.  ECF No. 27 & 29.  The Notice of

Voluntary Dismissal indicates that PSP "is not a proper Defendant in this matter."  ECF No. 29.

---

[1] The Court notes that, although he is identified as Trooper John Morningstar in the Complaint, ECF No. 1 and on the docket, Trooper Morningstar is identified as "Dane Morningstar" in defense filings and his declaration in support of his Motion for Summary Judgment.  *See* ECF No. 33-1.  To the extent necessary, the parties are directed to file an appropriate joint or consent motion to correct the docket.  The Court will simply refer to him in this Opinion as "Trooper Morningstar."

Given that "official-capacity suits 'generally represent only another way of pleading an action against an entity of which an officer is an agent,'" the Court further construes the Notice of Voluntary Dismissal as also terminating the Grossmans' *official* capacity claims against Trooper Morningstar. *Hafer v. Melo,* 502 U.S. 21, 25 (1991) (quoting *Kentucky v. Graham*, 473 U.S. 159, 165 (1985)).

Counts I and II of the Complaint are brought pursuant to 42 U.S.C. § 1983, while Counts III and IV assert state law claims. ECF No. 1. Specifically, the Grossmans allege that Trooper Morningstar used excessive force against Mr. Grossman (Count I) and falsely imprisoned him (Count II) in violation of Mr. Grossman's rights under the Fourth and Fourteenth Amendments. Count III asserts state law claims for false arrest and false imprisonment. Finally, Count IV asserts that Trooper Morningstar is liable to Ms. Grossman under state law for loss of consortium.

## B.    Material Facts

The following facts are undisputed, unless noted otherwise. On June 20, 2020, the Grossmans attended a memorial service for Ms. Grossman's mother at 2431 Mercer Butler Pike in Mercer, Pennsylvania where others were also in attendance. *See* ECF No. 32 ¶ 1; ECF No. 40-1 at 10:4–11:8 (Mr. Grossman Dep.). Mr. Grossman began drinking alcohol around noon and, by the time Trooper Morningstar arrived at around 4:00 p.m., had consumed between 6 and 8 cans of beer. *See* ECF No. 32 ¶¶ 3, 10; ECF No. 40 ¶¶ 3, 10. At some unspecified time that afternoon, Mr. Grossman and several other family members were inside a shed when Mr. Grossman and a relative, Brian Arblaster, got into a verbal disagreement. *See* ECF No. 32  ¶¶ 4, 5; ECF No. 40 ¶¶ 4, 5. Mr. Arblaster had also been drinking alcohol that day. *See* ECF No. 32 ¶ 4. The argument escalated, and Mr. Arblaster "sucker punched" Mr. Grossman on the side of the head, causing Mr. Grossman to fall out of the shed and lose consciousness. *See* ECF No. 32 ¶¶ 6–7; Mr. Grossman Dep., ECF No. 40-1 at 19:4–6. Ms. Grossman saw Mr. Grossman fall out of the shed and called

911 for an ambulance. *See* ECF No. 32 ¶ 9; ECF No. 40 ¶ 9. As a result of the emergency call, Trooper Morningstar and Trooper Neugebauer were also dispatched to the Mercer Butler Pike residence, arriving sometime after 4:00 pm. ECF No. 32 ¶ 10; ECF No. 40 ¶ 10.

The Grossmans attempt to dispute Trooper Morningstar's account of what happened next. Trooper Morningstar contends that when he arrived at the residence, he saw Mr. Grossman and Mr. Arblaster in a physical fight. ECF No. 32 ¶ 11; ECF No. 40 ¶ 11. According to Trooper Morningstar, Mr. Grossman and Mr. Arblaster were both laying on the ground facing in the same direction. *See* ECF No. 33-2 at 6:2 (Trooper Morningstar Dep.). Mr. Arblaster was behind Mr. Grossman and had his hands around Mr. Grossman's chest/neck area in a "kind of…bear hug[]." *Id.* at 6: 2–3. Mr. Grossman had his hands above his head, wrapped around Mr. Arblaster's neck. *See id.* at 6:3–4. Trooper Morningstar asserts that he asked Mr. Grossman to release Mr. Arblaster, and Mr. Grossman "screamed, 'No.'" *Id.* at 6:16–18. Trooper Morningstar and another officer, Trooper Neugebauer then physically separated Mr. Grossman and Mr. Arblaster. *See* ECF No. 32 ¶ 13.

The Grossmans deny that Mr. Grossman and Mr. Arblaster were still fighting when Trooper Morningstar arrived. *See* ECF No. 40 ¶ 11. Instead, they state that the two had reconciled and were walking arm-in-arm. *See id.*; *see also* ECF No. 40-5 at 17:20–23 (Ms. Grossman Dep.). The Grossmans further contend that just before the troopers arrived, the men had spoken with the EMTs (who arrived on scene first), and that Mr. Grossman had refused treatment. *See* ECF No. 40 ¶ 11; *see also* ECF No. 40-5 at 17:24–18:22. The Grossmans allege that when the troopers arrived, they walked over to Mr. Grossman, separated him from Mr. Arblaster, threw him to the ground and handcuffed him. *See* ECF No. 40 ¶ 11. Mr. Grossman asserts that Trooper Morningstar jumped on him to the point that he thought he had been kicked. *Id.* ¶ 14. Mr.

Grossman asserts that he did not hear the instruction from the police to release Mr. Arblaster. *Id.* at ¶ 12.

That said, the Grossmans' statements on their own are insufficient to create a genuine dispute of fact with regard to whether Mr. Grossman and Mr. Arblaster were fighting one another when Trooper Morningstar arrived on the scene. First, at his deposition, Mr. Grossman admitted that after he was initially knocked unconscious, he has no memory of the events immediately preceding Trooper Morningstar placing him in handcuffs:

> Q: I'm trying to get a sense of it. So you were hit. You were knocked out. So what is the next thing that you personally remember after that?
>
> A: Honestly, the next thing I can personally remember is Trooper Morningstar handcuffing me. I kind of like come to a little bit, and I asked him who he was, because at that point I thought I was getting jumped again.

ECF No. 40-1 at 20:11–18. Similarly, at her deposition, Ms. Grossman stated that, after speaking with the EMTs, she had returned to the porch of the house and could not actually see what transpired when Trooper Morningstar arrived. *See* ECF No. 40-5 at 20:8–18 (noting that she could not see and that, after the troopers arrived, she "sat on the porch for a bit. And then, after – they were just screaming and yelling."). In other words, while Ms. Grossman witnessed Mr. Grossman and Mr. Arblaster amicably interacting with each other and with EMS personnel, *see id.* at 17:13-23, neither Mr. nor Ms. Grossman personally witnessed or can recall whether Mr. Grossman and Mr. Arblaster had resumed their physical altercation at the time Trooper Morningstar arrived.

As such, the only evidence for the Grossmans' version of what was happening at the time Trooper Morningstar arrived is either inadmissible hearsay, *see* ECF No. 40-1 at 24:7–14 (Mr. Grossman testifying that he and Mr. Arblaster were "talking, like standing up, like, you know, kind of hugging each other," but that he could not "recall – other than what people have said."), or lacks an adequate foundation of personal knowledge. *See* ECF No. 40-5 at 20:5–19 ("Q: …did

4

you have a direct line of sight to Trooper [Morningstar]…and your husband?  A:  No, not while sitting on the porch.  Q:  So you couldn't see what they were doing at that point?  A:  No."); *see also* Fed. R. Evid. 801 (defining hearsay as an out-of-court statement offered for the truth of the matter asserted);  Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."). Some other evidence of what was happening when Trooper Morningstar arrived—an affidavit or declaration from one of the bystanders or EMS personnel, for example—would be sufficient to dispute Trooper Morningstar's account at summary judgment.  However, the. Grossmans' statements about events they did not see or do not remember are insufficient to create a genuine dispute of fact, because, without more, those statements are not capable of being put into admissible form for trial—indeed, the Grossmans do not even identify the individual(s) who told them Mr. Grossman and Mr. Arblaster were not fighting when Trooper Morningstar arrived.  *See Smith v. City of Allentown*, 589 F.3d 684, 693 (3d Cir. 2009) ("Hearsay statements that would be inadmissible at trial may not be considered for purposes of summary judgment.") (citing *Shelton v. Univ. of Med. & Dentistry of N.J.*, 223 F.3d 220, 223 n.2 (3d Cir. 2000) ("In this circuit, hearsay statements can be considered on a motion for summary judgment if they are capable of admission at trial."); *see also Messimer v. Albright Care Servs.,* No. 4:12-CV-02143, 2017 U.S. Dist. LEXIS 18838, at *10 (M.D. Pa. Feb. 10, 2017) (noting that "[a]lthough the [Third Circuit] has stated that Rule 602 creates a low threshold of admissibility, this low bar does not allow 'witness testimony that is merely based on speculation'") (citing *Sullivan v. Warminster Twp.*, 461 F. App'x 157, 162 (3d Cir. 2012)).  The Court therefore takes as undisputed that, while Ms. Grossman observed Mr. Grossman and Mr. Arblaster interacting amicably before police arrived on the scene, Trooper

Morningstar observed Mr. Grossman and Mr. Arblaster engaged in a physical altercation upon arriving at the Butler Pike residence.

Returning to the narrative, Trooper Morningstar next contends that, after the troopers separated the two men from fighting, Trooper Morningstar placed Mr. Grossman "on his back, and straddle[d] himself over" Mr. Grossman so that he could place him in handcuffs. ECF No. 32 ¶ 14.[2] Trooper Morningstar asserts that he used a "double locking" mechanism when handcuffing Mr. Grossman so that the handcuffs would not tighten when Mr. Grossman moved around. *See* ECF No. 32, ¶¶ 15–18. The Grossmans "admit[] that Trooper Morningstar testified that 'double locking' is his normal practice," but deny that Trooper Morningstar used the double-locking mechanism, thereby injuring Mr. Grossman's hand. ECF No. 40 ¶ 15. In other words, the Grossmans have no evidence to dispute that Trooper Morningstar used the "double locking" mechanism, but instead contend that, if the double-locking mechanism had been used, it would have prevented injury to Mr. Grossman's hand. *See id.* In any case, it is undisputed that Trooper Morningstar did not observe any injuries to Mr. Grossman's wrists or hands. *See* ECF No. 32 ¶¶ 21–22.[3]

The Grossmans assert that while Trooper Morningstar had Mr. Grossman in handcuffs placed prone on the ground, Trooper Morningstar pointed his finger to Mr. Grossman's head, mimicking a gun. *See* ECF No. 1 ¶ 1. The Grossmans provided a cell phone picture of this gesture *See* ECF No. 40-4. Trooper Morningstar contends that he was not intending to make the shape of

---

[2] The Court notes that the deposition testimony referenced to support paragraph 14 of Trooper Morningstar's statement of facts indicates that Trooper Morningstar straddled over Mr. Grossman's "hamstring/lower back/butt area," ECF No. 33-2 at 7:6–7, such that Mr. Grossman was laying facedown, not face up. This comports with photographic and video evidence of the incident. *See, e.g,* ECF No. 40-4.

[3] Trooper Morningstar's Concise Statement of Material Facts states, "At no point did [Mr. Grossman] indicate to Trooper Morningstar that the handcuffs were too tight." ECF No. 32 ¶ 21. In response, the Grossmans state, "Denied. Mr. Grossman does not recall because he had been recently knocked out." ECF No. 37 ¶ 21.

a gun, but rather was pointing to Mr. Grossman, in response to another person stating, "Our Dad is a diabetic." *See* ECF No. 32 ¶ 30; ECF No. 41, at 2 (Ex. I).[4]

It is undisputed that after Trooper Morningstar handcuffed Mr. Grossman, he placed Mr. Grossman in the police vehicle while he gathered information about the events. *See* ECF No. 31, at 11; ECF No. 33-2, at 8:17–9:14. Trooper Morningstar testified that once Mr. Grossman was in the vehicle, Mr. Grossman made a comment that he wanted to hurt himself. *See* ECF No. 32 ¶ 23. Trooper Morningstar spoke with family members who confirmed that Mr. Grossman would sometimes make self-harm comments. *See* ECF No. 33-2 at 12:6–12. Based on this information, Trooper Morningstar decided that he should transport Mr. Grossman to the hospital for a mental health evaluation. *See* ECF No. 32 ¶ 24. Mr. Grossman has no recollection of making a statement that he wanted to harm himself and Ms. Grossman did not overhear any such statement. *See* ECF No. 40 ¶ 23; *see also* ECF No. 40-1 at 26:7–10; ECF No. 40-5 at 24:2–24. It is undisputed that family members assisted Trooper Morningstar in placing Mr. Grossman on his left side in the vehicle because he was vomiting and to avoid pressure on Mr. Grossman's cuffed hands. *See* ECF No. 32 ¶¶ 25–27; ECF No. 40 ¶¶ 25–27.

Trooper Morningstar then transported Mr. Grossman to Sharon Regional Hospital. *See* ECF No. 32. ¶ 28; ECF No. 40 ¶ 28. Trooper Morningstar testified that he stopped twice along the way to the hospital to check on Mr. Grossman, who vomited multiple times in the back of the cruiser and who allegedly continued screaming profanities at Trooper Morningstar. *See* ECF No. 32 ¶ 29; *see also* ECF No. 33-2 at 17:12–18:11 (describing stopping to check on Mr. Grossman and noting that "[o]n the way there, he was MF'ing me the entire time…He threw up multiple

---

[4] Defense Counsel provided the Court with snippets of video footage of Trooper Morningstar placing Mr. Grossman in handcuffs. However, this footage does not contain audio, therefore, the Court cannot confirm what, if any, oral statements were made.

times on the way there.").  As with Mr. Grossman's alleged self-harm statements, Ms. Grossman

was not present for either Mr. Grossman's outbursts in the back of the cruiser or Trooper

Morningstar stopping to check on him, nor does Mr. Grossman himself recollect these events.  *See*

ECF No. 40 ¶ 29;  *see also* ECF No. 40-1 at 25:20–26:2 ("Q: Did you know that you had been

placed in handcuffs?  A:  Yes and no.  I remember, on the ground, he was saying he was going to

put me in handcuffs.  But then, after that – again I woke up in Sharon Regional Hospital.  Q: You

don't remember how you got there?  A: No.");  ECF No. 40-5 at 28:19–23 (Ms. Grossman

testifying that she "drove by myself" to the hospital).  Mr. Grossman also does not recall saying

anything to Trooper Morningstar during the drive about either wanting to hurt himself or about the

handcuffs.  *See* ECF No. 40-1 at 26:3–10.

## II.    Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

Civ. P. 56(a).  "Summary judgment is appropriate when the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

of law."  *Mann v. Palmerton Area Sch. Dist.*, 872 F.3d 165, 170 (3d Cir. 2017) (internal citations

and quotations omitted).  "A factual dispute is 'genuine' if the 'evidence is such that a reasonable

jury could return a verdict for the nonmoving party.'"  *Razak v. Uber Techs., Inc.,* 951 F.3d 137,

144 (3d Cir. 2020) (quoting *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986)). "A factual

dispute is 'material' if it 'might affect the outcome of the suit under the governing law.'"  *Id.*

(quoting *Anderson*, 477 U.S. at 248).

The burden to establish that there is no genuine dispute as to any material fact "remains

with 'the moving party regardless of which party would have the burden of persuasion at trial.'"

*Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1080 (3d Cir. 1996) (quoting *Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893, 896 (3d Cir. 1987)).  That said, "[i]f the non-moving party bears the burden of persuasion at trial, 'the moving party may meet its burden on summary judgment by showing that the nonmoving party's evidence is insufficient to carry that burden.'"  *Kaucher v. County of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (quoting *Wetzel v. Tucker*, 139 F.3d 380, 383 n.2 (3d Cir. 1998)).

Once the moving party has carried its initial burden, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts.… Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (citations omitted).  Thus, while "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor," *Anderson*, 477 U.S. at 255, summary judgment "requires the nonmoving party to go beyond the pleadings" and point to "'specific facts showing that there is a genuine issue for trial.'"  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (citation omitted).  But, while the court must "view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor…to prevail on a motion for summary judgment, the non-moving party must present more than a mere scintilla of evidence; there must be evidence on which the jury could reasonably find for the [non-movant]."  *Burton v. Teleflex Inc.*, 707 F.3d 417, 425 (3d Cir. 2013) (internal citations and quotations omitted).  If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to [the non-movant's] case, and on which [the non-movant] will bear the burden of proof at trial," Rule 56 requires the entry of summary judgment because such a

failure "necessarily renders all other facts immaterial."  *Celotex*, 477 U.S. at 322–23; *Jakimas v.*

*Hoffman La Roche, Inc*., 485 F.3d 770, 777 (3d Cir. 2007).

## III.   Analysis

### A.   Section 1983 Claims in Counts I and II

"To state a claim for relief under § 1983, 'a plaintiff must demonstrate the defendant, acting

under color of state law, deprived him or her of a right secured by the Constitution or the laws of

the United States.'"  *Cost v. Borough of Dickson City*, 858 F. App'x 514, 517 (3d Cir. 2021)

(quoting *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006)).  Section 1983 "provides a

cause of action against state actors who violate an individual's rights under federal law."  *Filarsky*

*v. Delia*, 566 U.S. 377, 380 (2012).  Section 1983 does not create substantive rights but instead

"provides only remedies for deprivations of rights established elsewhere in the Constitution or

federal laws."  *Kneipp v. Tedder*, 95 F.3d 1199, 1204 (3d Cir. 1996).

The Grossmans' § 1983 claims for excessive force and false imprisonment arise under the

Fourth and Fourteenth Amendments.  *See Williams v. City of York,* 967 F.3d 252, 259 (3d Cir.

2020) ("A cause of action exists under § 1983 when a law enforcement officer uses force so

excessive that it violates the Fourth and Fourteenth Amendments to the United States

Constitution.") (citation omitted); *James v. City of Wilkes-Barre,* 700 F.3d 675, 683 (3d Cir. 2012)

("A false imprisonment claim under § 1983 which is based on an arrest made without probable

cause…is grounded in the Fourth Amendment's guarantee against unreasonable seizures.")

(citation omitted).  "To maintain an excessive force claim, 'a plaintiff must show that a seizure

occurred and that it was unreasonable.'"  *Williams,* 967 F.3d at 259 (quoting *Estate of Smith v.*

*Marasco*, 318 F.3d 497, 515 (3d Cir. 2003)).  "To state a claim for false imprisonment," on the

other hand, "a plaintiff must establish: (1) that she was detained; and (2) that the detention was unlawful." *James*, 700 F.3d at 682–83 (citing *Wallace v. Kato*, 549 U.S. 384, 389 (2007)).

> **1.     There is a Genuine Dispute as to Trooper Morningstar's Use of Allegedly Overly Restrictive Handcuffs;     Otherwise, Trooper Morningstar's Use of Force Was Objectively Reasonable (Count I)**

In Count I, the Grossmans allege that Trooper Morningstar used excessive force when he tackled Mr. Grossman, jumped on his back, and retrained him with overly restrictive handcuffs. *See* ECF No. 1 ¶¶ 39–44.  Trooper Morningstar argues that (1) no Fourth Amendment violation occurred because the force he used was objectively reasonable, and (2) that even if there is a genuine dispute of fact as to the reasonableness of the force used, he is entitled to qualified immunity.  *See* ECF No. 31, p. 2.

In evaluating an excessive force claim, the Court looks at "whether a constitutional violation has occurred using the Fourth Amendment's objective reasonableness test."  *Santini v. Fuentes*, 795 F.3d 410, 417 (3d Cir. 2015) (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989)). In conducting this assessment, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Cty. of L.A. v. Mendez*, 137 S. Ct. 1539, 1546–47 (2017) (quoting *Graham*, 490 U.S. at 396));  *see also Saucier v. Katz*, 533 U. S. 194, 207 (2001) ("Excessive force claims…are evaluated for objective reasonableness based upon the information the officers had when the conduct occurred.").  Where there is video of the events, the court should "view[] the facts in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 381 (2007).  That is, at summary judgment on the grounds of qualified immunity, the Court must normally adopt "'the plaintiff's versions of the facts'…unless 'no reasonable jury could believe it;" as such, in cases with reliable video evidence, "courts must not adopt a version of the facts that is 'blatantly contradicted' by the

video footage." *Jacobs v. Cumberland Cty.*, 8 F.4th 187, 192 (3d Cir. 2021) (quoting *Scott*, 55 U.S. at 378, 380).

The Fourth Amendment excessive force "inquiry is highly individualized and fact specific." *Santini*, 795 F.3d at 417. There are several factors that the Third Circuit has said district courts may consider when evaluating the reasonableness of a particular use of force, including:

> (1) the severity of the crime at issue, (2) whether the suspect poses an imminent threat to the safety of the police or others in the vicinity, and (3) whether the suspect attempts to resist arrest or flee the scene …[and] [4] the possibility that the persons subject to the police action are themselves violent or dangerous, [5] the duration of the action, [6] whether the action takes place in the context of effecting an arrest, [7] the possibility that the suspect may be armed, and [8] the number of persons with whom the police officers must contend at one time.

*Id.* (citing *Graham*, 490 U.S. at 396 (factors (1) through (3)) and quoting *Sharrar v. Felsing*, 128 F.3d 810, 822 (3d Cir. 1997) (abrogated on other grounds) (factors [4] through [8]) (numbering added)). Finally, this "inquiry is dispositive: When an officer carries out a seizure that is reasonable, taking into account all relevant circumstances, there is no valid excessive force claim." *Mendez*, 137 S.Ct. at 1547.

Initially, the Court notes that the video recordings in the record here only capture events that took place after Trooper Morningstar handcuffed Mr. Grossman and before he placed him in the police vehicle. Furthermore, the Grossmans have not put forward any evidence that the Court can consider at summary judgment with respect to the situation Trooper Morningstar confronted upon arriving at the Butler Pike residence. That is, as noted above, the Grossmans' evidence— which amounts to little more than (1) "I don't remember," (2) "I didn't see," and (3) "somebody told me"—of this initial encounter is insufficient to rebut Trooper Morningstar's testimony that he observed Mr. Grossman and Mr. Arblaster engaged in a physical fight. That said, Mr. Grossman did testify to remembering that "[w]hen I hit the ground, I felt him jump – I felt something jump on my back. It almost felt like being kicked – you know kicked" with regard to what happened

when Trooper Morningstar pinned him to the ground, ECF No. 40-1 at 23:21–23, and photographic evidence shows that Mr. Grossman did suffer substantial bruising on his back/side. *See* ECF No. 40-2.

The question remains, therefore, whether Trooper Morningstar's uses of force—pulling Mr. Grossman and Mr. Arblaster apart, throwing Mr. Grossman to the ground, and his use of handcuffs on Mr. Grossman—were objectively reasonable. The Court, applying the *Santini* factors, concludes that, with the exception of the allegedly overly restrictive handcuffs, Trooper Morningstar's uses of force were objectively reasonable.

We begin with the initial encounter between Trooper Morningstar and Mr. Grossman, up to and including Trooper Morningstar first applying the handcuffs. First, although the fighting Mr. Grossman and Mr. Arblaster engaged in likely would not constitute an especially severe crime, Trooper Morningstar encountered two individuals who were actively fighting and who refused to separate voluntarily. Next, given that earlier fighting had already resulted in Mr. Grossman being knocked unconscious for at least a few minutes, the renewed combat between the two posed a threat to the safety of the police and/or others in the vicinity. Third, Mr. Grossman verbally refused Trooper Morningstar's commands and made handcuffing difficult. Fourth, there was a distinct possibility that Mr. Grossman was violent or dangerous given that he was engaged in fighting. Fifth, the initial encounter between Mr. Grossman and Trooper Morningstar was quite brief; however, Mr. Grossman did remain handcuffed for the duration of the 40 plus minute drive to the hospital. Sixth, Mr. Grossman was never arrested or charged with any crime. Seventh, it is undisputed that Mr. Grossman was not armed. Eighth, and finally, it is clear that Trooper Morningstar and his colleague were at least equally matched in terms of numbers by Mr. Arblaster

and Mr. Grossman during the initial encounter, and, later, Trooper Morningstar had to deal with multiple bystanders.

Taking into account the totality of the circumstances, the Court concludes that Trooper Morningstar's initial uses of force—separating Mr. Grossman from Mr. Arblaster, throwing Mr. Grossman to the ground, and pinning and handcuffing him—were objectively reasonable. Indeed, given Mr. Grossman's conduct (including fighting, yelling, kicking, and refusing to comply with officer commands), and the fact that Mr. Grossman did not seek out or require additional medical care for the bruising on his back/side, *see* ECF No. 40-1 at 30:20–31:1, the Court concludes that Trooper Morningstar applied an objectively reasonable amount of force in order to separate and control Mr. Grossman and Mr. Arblaster.[5]

With respect to how Trooper Morningstar applied the handcuffs, however, there is a triable question of fact. The Third Circuit has recognized as viable § 1983 claims for improperly applied and excessively tight handcuffs that result in serious injury. *See Kopec v. Tate*, 361 F.3d 772, 777 (3d Cir. 2004); *see also Gilles v. Davis*, 427 F.3d 197, 207 (3d Cir. 2005). In *Kopec*, A few factors weighed in favor of finding such a claim viable:

> Kopec alleges that Officer Tate placed handcuffs on him that were excessively tight and failed to respond to Kopec's repeated requests for them to be loosened. He estimates that it took Officer Tate ten minutes to loosen the handcuffs despite the severe pain they were causing and his efforts to secure their release. As a result, Kopec claims that he suffered permanent nerve damage to his right wrist. These facts, if credited, would establish that Officer Tate's use of force was excessive in violation of the Fourth Amendment.

*Kopec*, 361 F.3d at 777. In other words, and without either "overread[ing]" the Third Circuit's opinion in *Kopec* or reducing such claims to a set of hard-and-fast elements (which would stray

---

[5] Because the Court concludes that Trooper Morningstar's initial use of force was objectively reasonable under the circumstances—*i.e.*, that there was no violation of Mr. Grossman's Fourth Amendment right to be free from use of excessive force—the Court does not reach the question of whether Trooper Morningstar is entitled to qualified immunity for throwing Mr. Grossman to the ground, kneeling over him, and handcuffing him.

outside of the Court's obligation to evaluate whether a given police use of force was objectively reasonable), the Court finds that considerations relevant to evaluating an overly-restrictive-handcuff claim include:  (1) whether plaintiff was obviously in extreme pain or distress,  (2) whether the officer had some notice of plaintiff's pain/distress, and (3) whether plaintiff suffered significant injury because of the allegedly overly restrictive handcuffs.  On the other hand, the Third Circuit also emphasized in *Kopec* that such claims likely would not be viable in cases where officers were confronted with highly dangerous or volatile circumstances.  *See id.*

Here, it is undisputed that Mr. Grossman had consumed a substantial quantity of alcohol, had been knocked unconscious by Mr. Arblaster, and has little recollection of the events leading up to being treated at Sharon Regional Hospital.  It is undisputed that Trooper Morningstar used the "double locking" mechanism when applying the handcuffs to Mr. Grossman, which Trooper Morningstar claims should have prevented the handcuffs from tightening any further around Mr. Grossman's wrists.  It is also undisputed that Mr. Grossman suffered a significant injury to his left wrist—the same side that he was laid on in the back of Trooper Morningstar's vehicle for the drive to the hospital.  Finally, Trooper Morningstar's testimony, although not meaningfully disputed by the Grossmans, is ambiguous.  Although he does not recall Mr. Grossman ever complaining about the handcuffs in particular, Trooper Morningstar did testify that throughout the encounter Mr. Grossman was visibly and audibly upset—screaming, crying, kicking wildly, and vomiting. Likewise, although Trooper Morningstar testified that he stopped to check on Mr. Grossman during the drive to the hospital because Mr. Grossman was behaving erratically and vomiting, there is no evidence that Trooper Morningstar specifically checked Mr. Grossman's handcuffs during those stops.

In sum, and given the extent of the injury to Mr. Grossman's wrist (a partial ligament tear), *see* ECF No. 33-5, a reasonable jury could conclude that, notwithstanding Trooper Morningstar's use of the "double locking" mechanism, Mr. Grossman's erratic behavior in the back of the police vehicle signaled significant pain and/or distress, that Trooper Morningstar should have checked Mr. Grossman's handcuffs, and that by failing to do so for the entire ride to the Sharon Regional Hospital—upwards of 30 minutes—Trooper Morningstar used objectively unreasonable force on Mr. Grossman, resulting in severe injury. Indeed, although there is no evidence that Mr. Grossman specifically complained about the handcuffs, a jury could conclude that the fact that he was drunk, incoherent, and inconsolable—Trooper Morningstar testified that, before leaving for the hospital, "[t]here was no communicating with him. He was highly intoxicated. While I was talking to him trying to get him to calm down, he was yelling, screaming; then he would be crying; then he would be calm again," ECF No. 33-2 at 11:18–22—should have alerted Trooper Morningstar to Mr. Grossman being in distress. Finally, because it was clearly established at the time that the use of excessively tight handcuffs, where the plaintiff suffers injury and where the officer had some reason to know the plaintiff was in distress and the officer was not confronted by highly dangerous or volatile circumstances, is an objectively unreasonable use of force under the Fourth Amendment, Trooper Morningstar is not entitled to qualified immunity, either. *See Kopec,* 361 F.3d at 778 ("Therefore, we hold that the right of an arrestee to be free from the use of excessive force in the course of his handcuffing clearly was established when Officer Tate acted in this case, and that a reasonable officer would have known that employing excessive force in the course of handcuffing would violate the Fourth Amendment"); *see also James v. City of Wilkes-Barre*, 700 F.3d 675, 679 (3d. Cir. 2012) (court conducting qualified immunity analysis looks to "(1) whether the facts alleged by the plaintiff show the violation of a constitutional right; and (2) whether the

right was clearly established at the time of the alleged misconduct.") (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

Accordingly, as to the Grossmans' excessive force claim, Trooper Morningstar's Motion is GRANTED IN PART and DENIED IN PART, such that only the portion of Count I related to the use of allegedly excessively tight handcuffs may proceed to trial.

### 2. Trooper Morningstar is Entitled to Summary Judgment on the Claim for False Imprisonment (Count II)

In Count II, the Grossmans allege that Mr. Grossman was falsely imprisoned when Trooper Morningstar handcuffed Mr. Grossman, placed him in the back of a police vehicle, and then transported him to Sharon Regional Hospital, for what the Grossmans allege was a pretextual mental health evaluation. *See* ECF No. 1 ¶¶ 12–15, 55–57. Trooper Morningstar argues that he is entitled to summary judgment on the false imprisonment claim because "1) [Mr. Grossman] was never subject to arrest and, alternatively, 2) even if he was subject to arrest, Trooper Morningstar had ample probable cause to detain him." ECF No. 31 at 10. Specifically, Trooper Morningstar contends that "the evidence of records [sic] reflects that Plaintiff was subject to nothing more than a <u>Terry</u> encounter" because "in considering the totality of the evidence of record, Trooper Morningstar was reasonable and justified in securing [Mr. Grossman] and placing him in handcuffs," *id*. at 11. In particular, Trooper Morningstar points to evidence that Mr. Grossman "made a statement that he wanted to harm himself while in Trooper Morningstar's vehicle" and that "[a]fter hearing this statement, Trooper Morningstar made the determination that [Mr. Grossman] needed to be evaluated by a mental health facility and that he would transport him there." ECF No. 32 ¶¶ 23–24. The Grossmans, in opposition, contend that Mr. Grossman "does not remember making any comment indicating that he wanted to hurt himself," ECF No. 40 ¶ 23; *see also id.* ¶ 24 ("admitted that Trooper Morningstar made that determination [*i.e.* mental health],

however is it denied that it was because of a comment of self-harm"), but otherwise simply maintain that Trooper Morningstar lacked probable cause to either arrest Mr. Grossman or detain him in order to obtain a mental health evaluation. *See* ECF No. 38 at 3–4.

As noted above, "[t]o state a claim for false imprisonment, a plaintiff must establish: (1) that he was detained;  and (2) that the detention was unlawful." *Glaspie v. Cty. of Gloucester*, No. CV157691RBKAMD, 2018 WL 4179461, at *4 (D.N.J. Aug. 31, 2018).  Relevant here, "[t]he Fourth Amendment also applies to warrantless seizures for purposes of involuntary commitment, and the fundamental inquiry remains the same:  whether the government's conduct was objectively reasonable under the circumstances." *Catlett v. N.J. State Police*, Civil Action No. 12-cv-153 (JBS/AMD), 2015 U.S. Dist. LEXIS 169142, at *9 (D.N.J. Dec. 18, 2015) (citing *Doby v. DeCrescenzo*, 171 F.3d 858, 871 (3d Cir. 1999)).  As such, "[w]hen there is probable cause to believe that a person is a danger to himself or others, an officer may reasonably seize and detain a person for a psychiatric evaluation without offending the Fourth Amendment." *Id.* (citing *Must v. West Hills Police Dep't*, 126 Fed. App'x 539, 542-43 (3d Cir. 2005) ("[T]he temporary involuntary commitment of those deemed dangerous to themselves or others qualifies as a 'special need' permitting the state to act without a warrant.")).  Finally, as to evaluating the constitutionality of such a seizure, "[i]t is well settled that that Fourth Amendment applies to seizures made for civil purposes, and the central inquiry is the same as in the criminal context—whether the government's conduct was reasonable under the circumstances." *Must*, 126 Fed. App'x. at 542;  *see also Monday v. Oullette*, 118 F.3d 1099, 1102 (6th Cir. 1997) ("If a dangerous mental condition is analogized to the role of criminal activity in traditional Fourth Amendment analysis, a showing of probable cause in the mental health seizure context requires only a 'probability or substantial

chance' of dangerous behavior, not an actual showing of such behavior.") (citing *Illinois v. Gates*, 462 U.S. 213, 244 n.13 (1983)).

Trooper Morningstar's initial decision to handcuff Mr. Grossman and place him in the patrol vehicle was objectively reasonable. "Under *Terry v. Ohio*, 392 U.S. 1 (1968), and its progeny, a law enforcement officer may conduct a brief, investigatory stop when that officer has 'a reasonable, articulable suspicion that criminal activity is afoot.'" *McDonald v. Borough*, No. 07-4588, 2008 U.S. Dist. LEXIS 77774, *16 (E.D. Pa. Oct. 2, 2008) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123, 120 S. Ct. 673, 145 L. Ed. 2d 570 (2000). In conducting a *Terry* stop, an officer must be able to "point to specific and articulable facts which, taken together with rational inferences from those facts" reasonably warrant detaining the individual. *Karnes v. Skrutski*, 62 F.3d 485, 492 (3d Cir. 1995). Ultimately, courts look to the totality of the circumstances to determine the validity of a *Terry* stop. *See U.S. v. Sokolow*, 490 U.S. 1, 8 (1989).

At a minimum, and based on the information available to him from the dispatcher and what he observed when he arrived on the scene, Trooper Morningstar had reasonable, articulable suspicion to initially handcuff and detain Mr. Grossman. Ms. Grossman testified that she told the dispatcher that she "needed an ambulance, that my husband was just knocked out cold." ECF No. 40-5 at 12:4–5. When Trooper Morningstar arrived on the scene, he observed Mr. Grossman and Mr. Arblaster engaged in a physical altercation. *See* ECF No. 33-2 at 6:2–9. In order to gain control of the situation, Trooper Morningstar and Trooper Neugebauer separated Mr. Grossman and Mr. Arblaster, moving Mr. Grossman to Trooper Morningstar's police cruiser. *See* ECF No. 32 ¶ 13; *see also* ECF No. 33-2 at 8:12–20. Having separated the two combatants, Trooper Morningstar then proceeded to speak with bystanders, including Mr. and Ms. Grossman, about

what had happened.  As such, Trooper Morningstar's initial decision to detain Mr. Grossman amounted to nothing more than a lawful *Terry* stop.

During this time, Trooper Morningstar heard Mr. Grossman make a statement that he wanted to harm himself.  *See* ECF No. 32 ¶ 23.  The Grossmans dispute this fact on the basis that Mr. Grossman does not recall making any such statement, *see* ECF No. 40 ¶ 23;  however, it is undisputed that Mr. Grossman has no recollection of the events in question—from the time he was knocked unconscious by Mr. Arblaster to being at Sharon Regional Hospital—with the exception of Trooper Morningstar kneeling over him and placing him in handcuffs.  Given Mr. Grossman's statement, his state of intoxication, and statements made to Trooper Morningstar by family members present at the scene that Mr. Grossman had made similar statements in the past,[6] Trooper Morningstar had probable cause to conclude that Mr. Grossman might be a danger to himself or others, and, as such, that a mental health assessment was warranted.  As such, Trooper Morningstar's decision to transport Mr. Grossman to Sharon Regional Hospital was reasonable under the circumstances, and no Fourth Amendment violation occurred.  Accordingly, Trooper Morningstar's Motion for Summary Judgment as to the Grossmans' § 1983 false imprisonment claim will be GRANTED.[7]

## B.    State Law Claims in Counts III and IV

The Court now turns to address the Grossmans' claims arising under state law.  "[T]hese claims are before us pursuant to our power to exercise supplemental jurisdiction 'over all other

---

[6] The Court notes that, unlike the alleged statements the Grossmans attempt to rely on for the proposition that Mr. Grossman and Mr. Arblaster were not fighting when Trooper Morningstar arrived, the comments reportedly made to Trooper Morningstar about Mr. Grossman's history of self-harm statements are not hearsay.  In the former case, the Grossmans' attempt to rely on the statements for the truth of the matter asserted—*i.e.* that Mr. Grossman and Mr. Arblaster were no longer fighting.  In the latter case, comments about Mr. Grossman making self-harm statements in the past would not be offered for their truth—*i.e.* that Mr. Grossman had, in fact, made such statements—but for the simple fact that Mr. Grossman's family members made those comments to Trooper Morningstar.

[7] Because the Court concludes that no Fourth Amendment violation occurred vis-à-vis false imprisonment, the Court need not address whether Trooper Morningstar is entitled to qualified immunity on that claim.

claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy.'" *Russoli v. Salisbury Twp.*, 126 F. Supp. 2d 821, 867 (E.D. Pa. 2000); *see also* 28 U.S.C. § 1367(a).  Trooper Morningstar seeks judgment in his favor on all of the Grossmans' state law claims.

### 1.      False Arrest/False Imprisonment

As to Count III, for false arrest/false imprisonment under Pennsylvania state law, Trooper Morningstar argues that he is entitled to sovereign immunity under 1 Pa. C.S. § 2310 because he was acting within the scope of his employment.  *See* ECF No. 31 at 16.  The Grossmans do not appear to contest this argument, given that they devote the entire "argument" section of their briefing to contesting Trooper Morningstar's Motion as it pertains to the § 1983 claims.  *See* ECF No. 38 at 3–4.  A party that fails to address an argument in its brief in opposition to a motion for summary judgment waives that argument.  *Aetna Health Inc. v. Davila*, 542 U.S. 200, 212 n.2 (2004); *Travitz v. Ne. Dep't ILGWU Health & Welfare Fund*, 13 F.3d 604, 711 (3d Cir. 1994); *Fischer v. G4S Secure Sols USA, Inc.*, Civil Action No. 10-6792 (JBS/AMD), 2014 U.S. Dist. LEXIS 86139, at *46 (D.N.J. June 25, 2014) (collecting cases).

Even if the Grossmans had properly opposed Trooper Morningstar's Motion as to Count III, the Court concludes that Trooper Morningstar has met his burden to demonstrate that he is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56.  Under Pennsylvania law, "Commonwealth employees, such as state troopers, enjoy immunity from most state law claims." *Kintzel v. Kleeman*, 965 F. Supp. 2d 601, 606 (M.D. Pa. 2013) (citing *Brautigam v. Fraley*, 684 F. Supp. 2d 589, 593 (M.D. Pa. 2010)).  This immunity "shields Commonwealth employees from liability when their actions:  (1) cannot fit into one of the nine statutory sovereign immunity

exceptions;[8] (2) are not negligent; and (3) occur within the scope of their employment." *Id.* (citing *La Frankie v. Miklich*, 618 A.2d 1145, 1149 (Pa. Commw. Ct. 1992)).  And, "'conduct is within the scope of employment where:  (a) it is the kind [the employee] is employed to perform;  (b) it occurs substantially within the authorized time and space limits [and] (c) it is actuated, at least in part, by purpose to serve the master.'"  *Brumfield v. Sanders*, 232 F.3d 376, 380 (3d Cir. 2000) (quoting Restatement (Second) Agency § 228).

Trooper Morningstar's actions fall squarely within this grant of immunity.  First, the allegedly unlawful conduct—handcuffing Mr. Grossman and transporting him to the hospital for a mental health evaluation—does not fit into any of the exceptions to sovereign immunity enumerated in 42 Pa.C.S. § 8522.  Second, the Grossmans' claims sound in intentional tort—not negligence.  Third, and finally, Trooper Morningstar's actions were within the scope of his employment, given that they were the kind of acts he is employed to perform as a state trooper, they occurred within the time and space limits of that employment, and were done in furtherance of his duties as a state trooper.  As such, Trooper Morningstar is entitled to sovereign immunity for the Grossmans' state law claim of false arrest/false imprisonment at Count III, and his Motion for Summary Judgment as to that claim will be GRANTED.

### 2.      Loss of Consortium

Finally, Trooper Morningstar argues that he is entitled to summary judgment on Ms. Grossman's claim for loss of consortium (Count IV) because "a loss of consortium claim cannot be predicated on Plaintiff's Section 1983 claim."  *See* ECF No. 31 at 18.  Again, the Grossmans fail to oppose Trooper Morningstar's Motion on this point.  *See* ECF No. 38 at 3–4.  And, having

---

[8] The relevant statute, 42 Pa.C.S. § 8522, since amended, now provides for ten exceptions.

already found that Trooper Morningstar is entitled to sovereign immunity for Mr. Grossman's claim for false arrest/false imprisonment under state law (Count III), the Court concludes that Ms. Grossman's claim for loss of consortium consequently also fails.

Two principles lead to this conclusion. First, loss of consortium is a "purely derivative" cause of action. *O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 317 n.3 (3d Cir. 2007) (citing *Nigra v. Walsh*, 797 A.2d 353, 355 n.1 (Pa. Super. Ct. 2002)). Next, "[t]here is no derivative claim under § 1983 for loss of consortium." *Garcia v. Cty. of Bucks*, 155 F. Supp. 2d 259, 264 n.5 (E.D. Pa. 2001) (citing *Quitmeyer v. Southeastern Pa. Transp. Auth*., 740 F. Supp. 363, 370 (E.D. Pa. 1990)); *see also Thomas v. Shutika*, No. 4:12-CV-692, 2012 U.S. Dist. LEXIS 130784, at *3 (M.D. Pa. Aug. 24, 2012), *report and recommendation adopted by*, 2012 U.S. Dist. LEXIS 130782 (M.D. Pa. Sep. 13, 2012). Therefore, because only Mr. Grossman's § 1983 claim related to the use of excessively tight handcuffs remains, Mr. Grossman cannot maintain a claim for loss of consortium. Accordingly, Trooper Morningstar's Motion for Summary Judgment as to Count IV will be GRANTED.

## IV. Conclusion

For the foregoing reasons, Trooper Morningstar's Motion for Summary Judgment, ECF No. 30, will be GRANTED in part and DENIED in part, as follows:

- Except for Mr. Grossman's claim for excessive force related to the use of excessively tight handcuffs, Count I will be DISMISSED, and

- Counts II–IV will be DISMISSED in full.

An appropriate order will follow.

DATED this 22nd day of July, 2022.

BY THE COURT:

/s/ Christy Criswell Wiegand
CHRISTY CRISWELL WIEGAND
United States District Judge

cc (via ECF email notification):
All Counsel of Record